```
                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
                    Civil No. 04-4270(DSD/SRN)
```

Corn Plus Cooperative,

       Plaintiff,

v.                                                   **ORDER**

Continental Casualty Company, and
Lumbermens Mutual Casualty Company,

       Defendants.

    Gregory T. Spalj, Esq., Kristine Kroenke, Esq. and Fabyanske, Westra, Hart & Thomson, 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402 and Jane Volz, Esq. and Volz Law Firm, Ltd., Southfork Office Centre, 17315 Liberty Beach Court, Suite 100, Lakeville, MN 55044, counsel for plaintiff.

    Kevin R. Lewis, Esq., Jerome B. Abrams, Esq., and Abrams & Smith, 1250 U.S. Bank Plaza, 220 South Sixth Street, Minneapolis, MN 55402, counsel for Continental Casualty Company.

    Jeanne H. Unger, Esq., Mark R. Bradford, Esq. and Rider Bennett LLP, 33 South Sixth Street, Suite 4900, Minneapolis, MN 55402 and Janelle K. Christensen, Esq. and Tressler, Soderstrom, Maloney & Priess, 100 Village Green Drive, Suite 200, Lincolnshire, IL 60069, counsel for Lumbermens Mutual Casualty Company.

This matter is before the court upon defendants' motions for summary judgment and plaintiff's motions in limine. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motions and denies as moot plaintiff's motions in limine.

**BACKGROUND**

Defendants Continental Casualty Company ("Continental") and Lumbermens Mutual Casualty Company ("Lumbermens") issued Wanzek Construction, Inc. ("Wanzek") a commercial general liability insurance policy ("CGL policy") and an excess liability insurance policy ("Lumbermens policy") for construction work performed by Wanzek on an ethanol facility owned by plaintiff Corn Plus Cooperative ("Corn Plus"). The welding work performed by Wanzek did not comport with contract specifications due to incomplete weld penetration and allegedly caused increased bacterial infection in the corn mash used in the ethanol facility. Corn Plus and Wanzek ultimately settled their respective claims pursuant to a Miller-Shugart settlement agreement.[1] This is a declaratory judgment action to enforce that agreement against defendants, the insurers.

## I.   Procedural Background

In January 2001, Corn Plus contracted Wanzek to perform mechanical work for an expansion project of its ethanol facility. During the course of Wanzek's performance, Corn Plus withheld payments because Wanzek failed to perform in a timely manner or in conformity with its contractual obligations. In response to the

---

[1] Under Minnesota law, an insured may stipulate to a money judgment in favor of a plaintiff and, in return, the plaintiff releases the insured from personal liability and agrees to limit recovery from the insurer. This type of agreement bears the name of the Minnesota Supreme Court decision that first upheld such a settlement, Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982).

nonpayment, on December 3, 2001, Wanzek served and recorded a mechanic's lien against the construction property in the amount of $1,447,828. On January 14, 2002, Corn Plus sued Wanzek in federal court, alleging breach of contract, breach of warranty and negligence. Wanzek then commenced an action against Corn Plus in Minnesota state court to foreclose on its lien claim. The parties ultimately agreed to dismiss the federal court action, consolidated all claims in the state court action and settled their dispute pursuant to the terms of the Miller-Shugart agreement that forms the basis for this enforcement action.

The procedural background of this action is set forth in the court's order dated July 26, 2006, in which the court granted in part Corn Plus's motion for summary judgment. In that order, the court determined that the CGL and Lumbermens policies do not provide coverage for the direct and consequential damages of Wanzek's failure to perform the welding in conformity with its contractual obligations. Specifically, the court held that the "Your Work" and "Impaired Property" exclusions in the CGL policy excluded from coverage the costs of repairing and replacing the defective welds, including loss of production during the time the plant would be shut down to perform the repairs. However, the court determined that any bacterial contamination to the corn mash caused by Wanzek's defective welding is a covered item of property damage. Therefore any costs incurred by Corn Plus to remedy such

contamination would be covered under the CGL and Lumbermens policies.[2] Whether the welding work caused an increase in bacterial contamination remains in dispute.

Continental and Lumbermens now move for summary judgment, arguing that the Miller-Shugart agreement is unenforceable because (1) Corn Plus and Wanzek failed to allocate between covered and noncovered damages, (2) Wanzek stipulated to the contested fact issue of causation to trigger coverage, (3) the $2,500,000 settlement amount is unreasonable as a matter of law, (4) the agreement is a product of collusion and (5) an addendum to the agreement that permits the court to determine *ex post facto* a reasonable settlement amount renders the entire agreement unenforceable under Miller v. Shugart and its progeny.

## II. Factual Background

On January 17, 2002, Corn Plus informed Wanzek, through counsel, that its claims against Wanzek were based on Wanzek's failure to perform its welding work in a timely or workmanlike manner and failure to perform pursuant to its contractual obligations. (See Volz Dep. Ex. 6.) As a result, Corn Plus

---

[2] Specifically, the court held that the CGL and Lumbermens policies provide coverage for "bacterial contamination of the corn mash used in Corn Plus's ethanol facility and those damages causally related to that contamination, which include increased antibiotic treatments, increased operational costs to disinfect the corn mash and clean pipes, and plant shutdowns necessary to change cooling lines and address centrifuge issues." (July 26 Order at 23.)

4

calculated that Wanzek owed $232,000 for liquidated damages, $376,994 to repair the welds and $5,042,500 in production loss based on an estimated seventy-day plant shutdown during the repair. Corn Plus offered to settle its claims against Wanzek for $2,500,000. Corn Plus's attorney testified that the $2,500,000 settlement offer took into account all damages known as of January 17, which would include the costs associated with the repair and replacement of the welds. (See Volz Dep. at 143.)

Continental retained Barbara Burke to defend Wanzek against Corn Plus's claims. Burke initially valued Corn Plus's damages at less than $100,000. (Burke Dep. at 81.) In a letter dated May 8, 2003, prior to the parties' first mediation session, Corn Plus itemized its estimated damages as follows: $232,000 liquidated damages, $387,420 to repair the welds, $1,164,000 in production loss during an estimated thirty-day plant shutdown during the repair and $250,000 in miscellaneous incentives. (Id. Ex. 6.) In that letter, Corn Plus informed Wanzek that another possible measure of damages might be increased costs for yeast control over the life of the plant.

In June 2003, Corn Plus and Wanzek, through their respective experts, confirmed that the welds did not meet contract specifications due to inadequate penetration. (See Kroenke Aff. Exs. E-G.) As a result, Wanzek became aware that it could face contractual liability for the consequential damages related to the

5

repair of the welds even if its welding work was not the cause of increased bacterial infections. (Burke Dep. at 73-75.)

During a second mediation between Corn Plus and Wanzek in December 2003, Corn Plus itemized its claimed damages as follows:

```
Loss of Production During Weld Repair        $ 2,958,258.09
Cost to Repair Welds                         $   387,420.00
Radiography and QA/QC for Weld Repairs       $    15,000.00
Liquidated Damages                           $   232,000.00
Attorneys' Fees and Costs                    $   145,917.42
Estimated CCC/Bioenergy Program              $   100,000.00
Antibiotics and Agents to Control Infections $ 3,600,000.00
Total Damages                                $ 7,601,095.51
```

(Volz Dep. Ex. 12.) Corn Plus repeated its initial settlement offer of $2,500,000, and Wanzek proposed a $2,500,000 Miller-Shugart settlement. At the time of the mediation, Corn Plus's expert disclosures did not provide any specific calculations for damages based on increased antibiotic usage, decreased life expectancy of the plant, actual damages or loss of production as a result of the defective welds. (See Volz Dep. at 173-74, 177, 196-98 and Ex. 11.) The parties agreed to settle Corn Plus's negligence claim against Wanzek for $2,500,000 using a Miller-Shugart agreement. (Hart Dep. at 79.) However, it was not until January 2004 that Wanzek disclosed experts who would opine that the corn mash contamination was not causally related to the defective welds and that Corn Plus could not quantify a loss from the alleged

bacterial contamination.  (See Burke Dep. at 51-53, 147-151, Ex. 30.)  Whether the incomplete weld penetration caused an increase in bacterial infection has never been resolved.[3]

Following further negotiation on the value of Wanzek's lien, on March 8, 2004, Wanzek and Corn Plus executed a Miller-Shugart settlement agreement.  (See Kroenke Aff. Ex. N.)  Pursuant to the agreement, Wanzek stipulated to an adjudication that it was negligent in its welding and that its negligence resulted in $2,500,000 "in damages to Corn Plus'[s] fermentation and ethanol manufacturing process and facility."  (Id.)  In addition, Corn Plus agreed to pay Wanzek $396,708 to settle the parties' respective breach of contract and mechanic's lien claims.  According to Corn Plus's attorney, the $2,500,000 settlement represented all variables involved in the case, including the costs associated with the repair and replacement of the defective welds.  (Volz Dep. at 193.)  Wanzek and Corn Plus did not allocate the $2,500,000 in damages for Wanzek's alleged negligence by type of loss.

---

[3] Ethanol plants can naturally contain bacterial infection, and Corn Plus used antibiotics in its ethanol facility both as a preventative measure and due to inadequate drainage in its original fermentation tanks that resulted in an accumulation of residual corn mash.  (See Kor Dep. at 137; Unger Aff. Ex. G. at 119-20.)  Although incomplete weld penetration could increase such infection, numerous other potential sources of infection existed within the ethanol facility that could have caused an increase in the necessary antibiotics.  (See Kor Dep. at 28-29, 33, 137-38, 155-56; Unger Aff. Ex. G at 117-24.)

The Miller-Shugart agreement includes an addendum that permits the court to determine on a summary basis "the largest fair and reasonable settlement amount" and substitute that amount for the $2,500,000 judgment in the event the court determines that $2,500,000 is not a fair and reasonable settlement. (Kroenke Aff. Ex. N.) The agreement also contains a severability clause that expressly provides for severability of any provision that is invalid, illegal or unenforceable under Miller v. Shugart without impairment to the remainder of the agreement. (Id. ¶ 19.)

## DISCUSSION

### I. Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252. On a motion for summary judgment, the court views all evidence and inferences in a light most favorable

to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324.

## II. Enforceability of the Miller-Shugart Agreement

A Miller-Shugart agreement is enforceable against an insurer only if (1) it is reasonable and prudent, (2) it is not the product of fraud or collusion and (3) the insured provided notice to the insurer and thus did not violate a duty to cooperate. McNicholes v. Subotnik, 12 F.3d 105, 107 (8th Cir. 1993) (citing Miller, 316 N.W.2d at 733-35); Brownsdale Coop. Ass'n v. Home Ins. Co., 473 N.W.2d 339, 341 (Minn. Ct. App. 1991). To be reasonable, the agreement must reflect "what a reasonably prudent person in the position of [the insured] would have settled for on the merits of plaintiff's claim," taking into consideration the facts bearing on liability, damages and the risk of going to trial. Miller, 316 N.W.2d at 735; see also Jorgensen v. Knutson, 662 N.W.2d 893, 904-05 (Minn. 2003) (citing factors to consider). "Reasonableness" is a question of fact to be decided by the court because the reasonableness of the settlement "is not determined by conducting the very trial obviated by the settlement." Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 279 (Minn. 1990). The plaintiff has the burden to prove that the settlement was reasonable and prudent.

Burbach v. Armstrong Rigging and Erecting, Inc., 560 N.W.2d 107, 110 (Minn. Ct. App. 1997).

Continental and Lumbermens assert numerous challenges, as set forth above, to the enforceability of the Miller-Shugart agreement. Because the court determines that the agreement is unenforceable as a result of the parties' failure to allocate damages, the court does not reach the merits of defendants' additional arguments.

**A.   Failure to Allocate Damages**

Minnesota courts do not permit a party to seek reimbursement from an insurer under a Miller-Shugart agreement when the insured fails to allocate between covered and noncovered claims or damages. See Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co., 323 N.W.2d 58, 63-64 (Minn. 1982) (distinguishing between the cost of repairing and replacing faulty goods and work, which is a business expense to be borne by the insured, with damage to other property and holding no duty to indemnify covered damage claim of loss of rentals because settlement agreement did not allocate which monies were paid towards that claim); Ebenezer Soc'y v. Dryvit Sys., Inc., 453 N.W.2d 545, 549 (Minn. Ct. App. 1990) (claims may have been covered under CGL policy, but probable cause did not exist to believe insurers were liable because parties did not allocate covered and noncovered claims); see also Koehnen v. Herald Fire Ins. Co., 89 F.3d 525, 529 n.6 (8th Cir. 1996) (Miller-Shugart settlement unreasonable as a matter of law if no allocation).

In a context analogous to the facts of this case, the Minnesota Supreme Court held that failure to allocate damages among multiple defendants rendered the Miller-Shugart agreement unreasonable as a matter of law following a determination that the damages were covered under only a portion of the defendants' respective insurance policies. Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323 (Minn. 1993). The court reasoned:

> the trial judge was correct in holding that the lack of allocation of damages made the agreements unreasonable. Except in the most unusual case, we believe it is unreasonable for a defendant to settle a case for an unspecified sum. Further, there is no efficient way for the trial court to allocate the damages among the defendants. When a Miller-Shugart release is challenged on reasonableness grounds, no trial on the merits of the tort claim has been had. Without knowing what each defendant has agreed to pay as its share, there is no way of judging the reasonableness or prudence of the agreement from the standpoint of each defendant. No efficient method exists here to allocate liability among various parties who have not been adjudicated liable. The trial court properly held the unallocated Miller-Shugart agreements unenforceable as to the insurers.

Hangsleben, 505 N.W.2d at 331.

Corn Plus argues that the Miller-Shugart agreement is enforceable because it encompasses only covered items of damages. The agreement was limited to Corn Plus's negligence claim. However, a factor in reaching the $2,500,000 settlement amount was the loss of production during the repair of the defective welds, a damage not covered under the CGL policy. (See Volz Dep. at 192-93;

Hart Dep. at 169-70; Burke Dep. at 139.)  Corn Plus has offered no evidence to support its proposition that the $2,500,000 did not encompass the consequential damages associated with the cost of repairing the welds.[4]  The parties' failure to allocate covered and noncovered items of damage precludes enforcement of their agreement against Continental or Lumbermens.  Stated differently, because the $2,500,000 accounts for noncovered damages, that settlement amount is not reasonable as a matter of law for the covered damages.

### B. Enforceability of the Addendum

If there is coverage for claims settled under a Miller-Shugart agreement but the settlement amount is unreasonable or the agreement is held to be unenforceable, the remedy recognized by the Minnesota Supreme Court is to reinstate the underlying tort claims for trial and return the parties to the status quo ante.  See Koehnen v. Herald Fire Ins. Co., 89 F.3d 525, 529 (8th Cir. 1996); Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 280 (Minn. 1990).  The "fact that such a trial is a possibility, with its attendant delay, expense and risk, may help deter overreaching in the negotiation of a Miller-Shugart settlement," while avoiding

---

[4] The Miller-Shugart settlement provides that "Wanzek and Corn Plus expressly agree that they have segregated Corn Plus'[s] claims for damages to its fermentation and ethanol manufacturing process and facility and the Judgment amount represents a fair and reasonable settlement for these claims."  (Kroenke Aff. Ex. N. ¶ 2.)  However, the agreement does not indicate which items of damages the $2,500,000 represents or what percentage of the $2,500,000 represents the various categories of damages set forth in Corn Plus's mediation brief.

12

"the harsh overkill of a forfeiture of the main action." <u>Alton M. Johnson</u>, 463 N.W.2d at 280.

The parties negotiated the addendum providing that upon a determination that the $2,500,000 is unreasonable, the court "shall determine on a summary basis what the largest fair and reasonable settlement amount is and substitute that amount." (Kroenke Aff. Ex. N.) Corn Plus argues that the court should give effect to the addendum and determine a reasonable settlement amount for the covered damages. Continental and Lumbermens argue that the addendum violates public policy, contravenes Minnesota Supreme Court precedent, is per se evidence of overreaching and renders the entire Miller-Shugart agreement unenforceable as a matter of law.

The addendum does not render the entire Miller-Shugart agreement unenforceable because even if it violates public policy the addendum is severable from the remainder of the agreement. (<u>See</u> Koenke Aff. Ex. N. ¶ 19.) As to the addendum itself, Corn Plus argues that the parties were free to contract for a court determination of an alternative, lesser settlement amount that is reasonable and collectible from an insurer. However, the Minnesota Supreme Court has specifically considered and rejected on policy grounds the remedy Corn Plus seeks through enforcement of the addendum. <u>See</u> <u>Alton M. Johnson</u>, 463 N.W.2d at 280. Moreover, even if the court were to enforce the addendum, there is no efficient or practical way to determine a reasonable settlement amount for the

13

covered damages due to the parties' failure to allocate. Therefore, the court declines to determine a lesser amount that Corn Plus can enforce against Continental and Lumbermens for the covered items of damages it allegedly settled with Wanzek.

For these reasons, the Miller-Shugart agreement is not enforceable, and summary judgment in favor of Continental and Lumbermens is warranted.

**III.  Defendants' Request to Strike**

Continental and Lumbermens ask the court to strike the affidavits of Greg Coil and Mark Oberle that were filed in support of Corn Plus's opposition to defendants' motions for summary judgment. (See Kroenke Aff. Exs. A, B.)  Defendants argue that the testimony of Coil and Oberle is not relevant to whether the settlement was reasonable because the information contained in the affidavits was not available to Wanzek or Corn Plus at the time they negotiated the settlement.  Because the court does not reach the issue of whether the $2,500,000 settlement amount was reasonable for the covered damages, the court denies defendants' request as moot.

**IV.  Motions in Limine**

Corn Plus moves to exclude from trial the testimony of Robert McCollum and Dr. Edward E. Funk, defendants' expert witnesses. Because the court has concluded that summary judgment is warranted

in favor of Continental and Lumbermens, the court denies plaintiff's motions in limine as moot.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant Continental Casualty Company's motion for summary judgment [Doc. No. 153] is granted.

2. Defendant Lumbermens Mutual Casualty Company's motion for summary judgment [Doc. No. 158] is granted.

3. Plaintiff Corn Plus Cooperative's motions in limine [Doc. Nos. 200 and 206] are denied as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   January 9, 2007

                                          s/David S. Doty
                                          David S. Doty, Judge
                                          United States District Court